ALBERT AKERS ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

[No. 11, April Term, 1941.]

*Decided May 20th, 1941.*

The cause was argued before BOND, C. J., SLOAN, JOHNSON, DELAPLAINE, COLLINS, and FORSYTHE, JJ.

*J. Francis Ireton,* for appellants.

*R. Contee Rose,* for Westover Manor, Inc., Charles H. Steffey, Inc., and A. Lloyd Goode Co., appellees.

*William H. Marshall, Assistant City Solicitor,* with whom was *Charles C. G. Evans, City Solicitor,* on the brief, for the Mayor and City Council of Baltimore, appellee.

BOND, C. J., delivered the opinion of the Court.

This appeal is by neighbors and taxpayers in the western portion of Baltimore City, from an order of the Baltimore City Court on appeal from the Board of Zoning Appeals, denying their petition to disapprove and restrain the proposed erection of what are called garden type of apartments nearby, because in violation of the zoning of that area under the Zoning Ordinance of the city, number 1247, approved March 30th, 1931. The Buildings Engineer of the city first refused a permit for the erection, but the Board of Zoning Appeals reversed that action, and the court below concurred in the decision of the Board.

The area, lying between Cook's lane and Edmondson avenue, is in a district classed as a residential use, E area district, that is, one in which the land is not to be devoted to commercial uses, and in which a building shall be limited in height to forty feet, must have two side yards of ten feet each, or one of fifteen feet, a rear yard of not less than twenty-six feet, and a front yard of at least twenty-six feet on a sixty-foot street, or thirty-seven and a half feet on a thirty-two foot street, and must occupy not more than thirty per cent of its lot area if on an inside lot, forty per cent if on a corner lot, with each house having no more than its proportion of sixteen families per acre. By paragraph 29 (c), of the ordinance the Board of Zoning Appeals is empowered to give special permission for the erection in such areas of apartment houses complying with these requirements and on April 12th, 1940, the Westover Manor, Inc., through Charles H. Steffey, Inc., as its agent, and the A. Lloyd Goode Company as builder, applied to the Buildings Engineer for a permit to construct on the land, 8.2 acres in extent, six apartment houses, or groups of houses, only two

stories in height, five of them extending irregularly in units with the appearance of so many individual dwellings, but each unit containing four apartments. These units were planned to overlap and connect at the corners, leaving them separate fronts, sides and backs, except for the corner connections, where the foundation walls and roofs are to be continuous. They would have no access from one to another above ground, and only somewhat inconvenient access below. All would be supplied in common with water, electric light, heat and sewerage. The six separated buildings or groups, on separated lots, are to contain twenty-seven units in all, housing one hundred and eight families. The plans show two new streets projected through the area, and two automobile parking lots in it. The objections of the neighboring owners bring in question for the first time in the State the permissibility of this construction in such an area.

The foremost question is whether, in testing compliance with the ordinance, each structure of the several units combined is to be taken as a single building or as a group of buildings, so that the project is to be considered as one for the erection of twenty-seven buildings. If twenty-seven, then the inside buildings of the groups will lack the requisite side yards. The ordinance does not deal with this type of apartment house specifically, and the arguments have pointed out resemblance to types some of which are permitted in such a district and some are not. It has some resemblance to the more familiar apartment house with several entries, the possession of which does not render the structure a violation of the ordinance. On the other hand it has resemblances to a connected row of houses, which would be restricted to other districts. The owner of houses built together in a row would hardly contend that they complied with the requirements in an E area if they had the requisite side yards only at the ends of the row.

If these structural resemblances only should be regarded, the question of classification might be close, for the distinctions are slender. But when we consider the

intended singleness in use and operation, and the facts
that there is to be no letting of units, but only a letting
of suites in them, that the six structures are to be owned
and maintained by a single owner as six units, the build-
ings to be at the care of the owner, with conveniences
supplied to all by him, exactly as with apartment houses
of the more familiar, unbroken lines, the description of
each group as an apartment house seems appropriate, as
the Court below found. In the face of the unity in the
use, the partial separation of the walls and the possession
of several entries proposed here is not enough to justify
holding, in testing compliance with the ordinance, that
there are twenty-seven apartment houses to be con-
sidered.

A second objection is that spaces designed for parking
of automobiles are not permissible in this E area, and
that if permissible otherwise cannot be considered as part
of the open areas required on the lots. The parking is
designed for the cars of tenants in the apartments only,
according to the testimony, and it is not seen how this
use can be considered a commercial one. A garage build-
ing might be subject to some specifications in the ordi-
nance, but open spaces are not. There are some dangers
from accumulation of cars in one space, as counsel point
out, but so there are from garages or storage places be-
hind single houses, and these are not prohibited; they
are expressly allowed. Occupants of ordinary houses
are not prohibited from parking cars in their yards.
There seems to be no prohibition in the ordinance which
the court could apply to restrict the use of the parking
spaces. Of course, if they should be opened to com-
mercial use, for others than the tenants, the court could
furnish a remedy; but this use is not commercial if the
testimony is to be believed.

And whatever the objections in fact to the inclusion
of the parking spaces in the open spaces or yards re-
quired, the ordinance itself does not prohibit it. "Yard"
is defined as "the clear unoccupied space on the same lot
with a building required by the provisions of this ordi-

nance." Par. 44 (1). This cannot mean that nothing can be put on the space temporarily; there might be a variety of uses made other than by buildings which would leave the spaces still unoccupied, and yards, in the sense of this definition. It is with buildings that the ordinance is concerned in the definition, and so long as a space is occupied by none, there is, as the court sees it, no restriction against parking cars in the space required for yards. The protestants regard the restrictive designation of the use, for parking spaces, as a departure from the purpose of the ordinance in requiring yards, and perhaps there is ground for this conception of requirements for a suburban residential development, but it would require a more definite statement in the ordinance to enable a court to find in it a prohibition of the use.

The Commission on City Plan approved the proposed sub-division on condition that the two adjacent public highways, Cook's lane and Edmondson avenue, be widened in the future by taking from the property, and the owners agree to make provision for the widening, as they must; so that the plans can be considered as modified to that extent. The area of one lot as now planned will by the widening of Edmondson avenue be reduced to 1/27 acre, or an area for which the Zoning Ordinance permits the housing of only twenty families instead of the twenty-eight planned. And with Cook's lane widened as directed the proposed front yards of two groups will be reduced to eighteen feet, whereas the ordinance requires twenty-six. The adjustment is not shown, but with the proffer of adjustment of the plans made there is no room for disapproval and restraint of the project because of the need of it.

Objection is made that the Board of Zoning Appeals lacked power to render its decision on appeal, because a provision in the City Charter, constituting the Commission, prohibited the issue of any permit for such a new sub-division until the Commission had approved it, and the Commission had not approved this one when

the Board acted. Charter, sec. 264 C. The Commission was established by an amendment to the charter approved by popular vote on May 2nd, 1939, and among other functions was given that of regulating and approving, or disapproving, the arrangement of streets in sub-division plans in the city. It did not take action with reference to this particular property until June 27th, 1940, whereas the Board of Zoning Appeals rendered its decision reversing that of the Buildings Engineer on June 14th, 1940. The Board of Zoning Appeals does not, however, issue permits; that is done by the Buildings Engineer after the Board has decided any contest; and the Buildings Engineer issued the permit for this enterprise on July 9th, 1941, after the Commission on City Plan had acted, approving the project. The appeal by the neighbors and taxpayers was entered on the day before, July 8th, 1941. Lack of a decision by the Commission would have delayed the issue of the permit until the decision was rendered, but the court does not find in that requirement any interference with the performance by the Board of Zoning Appeals of its duties under the ordinance subject to the approval of the Commission acting within its functions. The Commission was not intended to supersede the Board. And as the permit was not issued until after the Commission had given its approval, there is no departure from the terms of the charter provisions.

*Order affirmed, with costs.*