This is an appeal by Norwood Heights Improvement Association, Inc., appellant, from a decision of the Baltimore City Court affirming a resolution of the Board of Municipal and Zoning Appeals approving an application for a permit by the Stulman Building Company, Inc., one of the appellees, (hereinafter known as appellee), to erect on a 15 acre tract, 10 apartment buildings made up of 34 units containing 168 suites and open parking spaces for 168 cars thereon.
The appellee contends that a correct interpretation of Section 135 of the Baltimore City Charter requires an appeal from the Board of Municipal and Zoning Appeals, in a case involving zoning, to be taken to the Baltimore City Court within 20 days, and, as the appeal in this case was not taken within that time, the appeal should be dismissed here. In the case of DeLancey B.Scrivner v. Mayor City Council of Baltimore and Chesapeake Potomac Telephone Company, 191 Md. 165, 60 A.2d 190, advanced and heard with the case at bar, in an opinion by Judge Grason, this Court holds that such an appeal having been filed within 30 days is properly before us. It is unnecessary therefore that we discuss that point in this case.
Paragraph 32 (d) of Ordinance No. 1247, provides in part: "If an application is disapproved by the Board of Zoning Appeals, thereafter the Board shall take no *Page 159 
further action on another application for substantially the same proposal, on the same premises, until after six (6) months from the date of such last disapproval." Appellant contends therefore that the Board of Municipal and Zoning Appeals exceeded its authority in approving the application in the instant case, because it is substantially the same proposal as that covered by the application made by Stulman Building Company, appellee, in application in appeal No. 588-47, which application was denied in a former appeal by Judge Niles, in the Superior Court of Baltimore City, within less than six months before the present application was acted upon. It is evident that the pending application is not substantially the same as that previously applied for. The previous application was for apartment buildings for 179 families, 150 parking spaces, and 26 garage buildings. The apartments consisting of 3 1/2, 4 and 4 1/2 rooms, made up of 38 units comprised 12 building groups. That application violated the zoning ordinance because of the garage buildings, and also because 118 families were to be housed in the E-area of the tract on 5.2 acres where only 84 families were permissible. It will be seen that the present application is not substantially the same as that previously denied in the Superior Court of Baltimore City.
The plan of the development in this case shows a tract of land, after the area for streets is deducted, of 9.3 acres located partly in E-area and partly in C-area districts, where row houses are prohibited. 80 families are to be housed on the 5.2 acres which constitutes the E-area, which is within the limit under the zoning law. 88 families are to be housed on the 4.1 acres which comprise the C-area, which is well within the limit provided by the zoning ordinance. The project calls for a garden apartment development. There are 168 open-air off-street parking spaces for the use of tenants. The apartment houses are comprised of groups of two-story units containing varying numbers of apartments. The apartments are of four and five rooms. 34 such units are *Page 160 
grouped into the 10 apartment buildings. These units are planned to over-lap and connect at the corners, leaving them separate fronts, sides and backs, except for the corner connections, where the foundation walls and roofs are to be continuous, as in the case of Akers v. City of Baltimore, 179 Md. 448, 20 A.2d 181. Each apartment building is heated by a common heating plant from a central boiler. Each group has its own water and sewage pipes and playground facilities. Each unit is to be encompassed by a firewall. There is a continuous foundation for each group and each group constitutes one building under one roof. The appellee claims that none of the apartment buildings are to be sold separately, nor can any of the units be separated from the apartment group of which they are a part. It claims that no basements are to be put under most of the units, nor places for separate heating and other facilities are provided, and the cost of excavating basements would be costly and difficult. It is contended that the project is to remain as an entity under the ownership and control of the appellee which will manage it, rent out individual apartments, and collect the rents. The open-air parking spaces and play-ground are for the common use of all tenants and are not to be rented to anyone. There is only one gas meter, one water meter and one electric meter for the entire project. It is all financed by one mortgage on the entire development. The appellee strenuously contends that the project is designed and will always remain as one unit. It is admitted, however, by the appellee, that there are no "lot lines" laid out on the project for each building.
The primary question for us in this case is whether the present application violates the area and yard provisions of Paragraphs 21 and 24 of Ordinance No. 1247, supra. Paragraph 44 (b) provides:
"Lot. A lot is a parcel of land now or hereafter laid out and occupied by one building and the accessory buildings or uses customarily or necessarily incident to it, *Page 161 
including such open spaces as are required by this ordinance."
Paragraph 44 (1) defines a yard as:
"The clear, unoccupied space on the same lot with a building required by the provisions of this ordinance."
Paragraph 44 (m) defines a front yard as:
"A clear, unoccupied space on the same lot with a building, extending across the entire width of the lot and situated between the front line of the building and the front line of the lot."
Paragraph 44 (n) defines a rear yard as:
"A clear, unoccupied space on the same lot with a building, extending across the entire width of the lot and situated between the rear line of the building and the rear line of the lot."
Paragraph 44 (o) defines a side yard as:
"A clear, unoccupied space on the same lot with a building and extending for the full length of the building between the building and the side lot line."
Paragraph 44 (u) defines a group house as:
"Not less than three and not more than six single family habitations, designed and erected as a unit on a lot."
Appellee relies strongly on the case of Akers v. City ofBaltimore, 179 Md. 448, 20 A.2d 181, supra, which involved a permit for a more or less similar type of garden apartments. However, the six separated buildings or groups containing 27 units and housing 108 families in that case, were on separate lots. It was said there, 179 Md. at page 451, 20 A.2d 182: "The six separated buildings or groups, on separated lots, are to contain twenty-seven units in all, housing one hundred and eight families." The zoning ordinance #1247, supra, in Paragraphs 21 and 24, sets up the percentage of area of lot, rear yards, side yards and population density. The definitions in Paragraph 44,supra, seem to make it clear that "lots" and "buildings" are the units of zoning. The opinion in Akers v. City of Baltimore,supra, 179 Md. at pages 450, 451, 452, and 453, 20 A.2d 181, 182, *Page 162 
183, emphasizes the fact that there are lots for each building in that case. Chief Judge Bond, who wrote that opinion, carefully considered whether an aggregation of garden type apartments constituted six buildings, "on separate lots", or 27 buildings. Nothing in that opinion remotely suggested that the whole "development" could be regarded as one building. See alsoColati v. Jirout, 186 Md. 652, 47 A.2d 613.
Perhaps a surveyor or an advanced mathematician might keep the score of percentages of the whole, though this would be difficult and not worth doing. A wilderness at the rear of the whole might furnish percentages for row houses where row houses are prohibited. Unless lots are defined in advance, sales of parts might leave a crazy-quilt of remnants and force the zoning authorities either (a) to rezone and thereby remove restrictions or else (b) to block further sales — or even use of the property — by maintaining restrictions that have become unworkable. "Yard" requirements, however, expressed not in percentages but infeet, mean nothing at all except with reference to define "lots" and "buildings".
To disregard "lot lines" and treat an entire development as a unit would seem to disregard the plain words of the zoning ordinance. It is, of course, true that it is undoubtedly the intention of the present owners to keep this whole project as a single unit and under one ownership and, if that is done, compliance with the zoning laws as to "lot lines" will not embarrass the owner. However, if because of voluntary, or even forced sale by reason of financial difficulties, the buildings in the project hereafter become separately owned and changes in lines then become necessary, that will be the owner's problem, as it should be. This possibility, however, does not seem to justify the ignoring of the plain requirements in the zoning laws requiring division into lots. It is, of course, possible that the plans for this project might be revised to provide for "lot lines" for each building. *Page 163 
The order affirming the decision and resolution of the Board of Municipal and Zoning Appeals in this case must therefore be reversed.
Order reversed, with costs.