SHAPIRO ET AL. *v.* MAYOR AND CITY COUNCIL OF BALTIMORE

[No. 74, September Term, 1962.]

*Decided December 11, 1962.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Charles C. W. Atwater* and *Thomas A. Garland,* with whom was *Walter C. Mylander, Jr.,* on the brief, for appellants.

*Donald N. Rothman,* with whom were *Gordon, Feinblatt & Rothman, Francis B. Burch, City Solicitor,* and *John A. Dewicki, Assistant City Solicitor,* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Things are not always what they seem say the appellants, referring to their contention that the zoning authorities of Baltimore, sustained by the Baltimore City Court on appeal, when they approved the erection of three hundred twenty apartment units as a garden type apartment project were led astray because the two-story house-like structures (living and dining facilities on the first floor and sleeping quarters on the second) to be erected in batteries of fourteen around central parking areas, were in fact no more than row houses, prohibited in the area. They argue further that even if the dwelling units are not row houses, the fact that they are heated by individual units, rather than by central heating, bars them from compliance with the requirement of the zoning ordinance that garden type apartments have "central heating."

The apartments are planned to cover some fifteen per cent of a tract of land having a gross area of over twenty-one acres and a net area, exclusive of streets and ways, of just over twenty acres. The tract is bounded on two sides by Leakin Park and is near Forest Park Avenue south of Windsor Mill Road. The area is zoned E-40 which permits a density of sixteen families to the acre only, and so forbids row houses. The Sponsor, Relocation Housing Corporation (Relocation), an appellee, is a non-profit, non-stock corporation of Maryland, formed pursuant to the provisions of Title 1 of the Federal Housing Act of 1961 (designed to assist private enterprise in

providing housing for low and moderate income families, especially those displaced from urban renewal areas or by other governmental action). The Housing Act provides for long term, non-prepayable mortgage loans up to 98% of the cost of a project, the loan to be made by a private agency and purchased by the Federal National Mortgage Association, with a net interest cost to the Sponsor of but $3\frac{1}{8}\%$. This low interest cost permits a one bedroom apartment to bear a rental of about thirty dollars a month less than conventional financing would allow, with similarly lower rents for two and three-bedroom units. The Federal Housing Authority required the Sponsor to execute a Regulatory Agreement under which it must accumulate a reserve fund of $1,000 a month from rentals for maintenance of the apartments and the surrounding grounds and replacement of equipment. The Sponsor must maintain all ways and parking areas, remove snow, collect and dispose of trash, maintain lawns, install and maintain landscaping, repaint and redecorate apartments, replace refrigerators, screens, gas ranges and heating and air conditioning units, and make all repairs. Each apartment has its own heating and air conditioning unit supplied with fuel from a central system, but water is supplied to all apartments by the Sponsor—there are seven meters for the 320 apartments—and sewage disposal is by a common system. The Sponsor must retain ownership of the project. It pays all taxes and carries insurance of various kinds on the project as a whole. The apartments, each of which has its own ground-level front and rear doors, cannot be separately disposed of or owned. The third bedroom of each three-bedroom apartment lies over the kitchen of an adjoining one bedroom apartment. There is a central laundry room. No individual clothes washing equipment is allowed.

The Zoning Commissioner granted Relocation authority to proceed under Sec. 25-N of the Baltimore City Zoning Ordinance (Art. 40 of Baltimore City Code of 1950), permitting, in certain areas where they would not otherwise be permitted, "Apartment houses designed and erected as a project with singleness of use and operation and with central heating and other facilities commonly known as garden type apartments,"

under specified conditions and restrictions. Protesting neighbors appealed to the Board of Municipal and Zoning Appeals (the Board).

The Chairman of the Board proposed a resolution upholding the action of the Commissioner in granting the permit for the project. Three of the five members of the Board, feeling that the project did not qualify as garden type apartments, voted against the resolution and the other two voted for it. Because the Board has interpreted the Baltimore Zoning Ordinance to require the concurring vote of four members to override action of the Commissioner, the Chairman determined and ruled that the resolution to approve the permit was carried. The protesting neighbors argued to Judge Oppenheimer on appeal that the majority vote against the resolution was sufficient to reverse the Commissioner. Judge Oppenheimer held it was not necessary to decide the point because whether the magic number was four or three, the single question before the court was one of law—the construction of Sec. 25-N of the Zoning Ordinance.

Here the appellants make the preliminary contention that if they are right in their view that the vote of four members is not a prerequisite to reversal of the Commissioner and a simple majority suffices, there was no issue before the lower court on appeal because neither of the appellees—the Mayor and City Council and Relocation—brought the merits to the City Court, and their appeal did not. In the alternative they argue that if it be held that the three to two vote of the Board did reverse the Commissioner and the merits are before the Court, great weight should be given to the expertise of the Board in deciding the real issue.

Section 35 (g) of the Zoning Ordinance of Baltimore, conforming to the requirements of the Statewide Enabling Act, Code (1957), Art. 66B, Sec. 7 (g), provides that the Board shall have the power (1) to decide appeals alleging error in any determination of the Zoning Commissioner made "in the enforcement of this Article"; (2) to decide special exceptions on which the Board is required to pass; (3) to authorize upon appeal in specific cases certain variances. Section 35 (h)

provides that in exercising these powers the Board may affirm or reverse, in whole or in part, and may make such determination as ought to be made "and, to that end, shall have all the powers conferred upon the Zoning Commissioner by this Article." Section 35 (i) says:

> "The concurring vote of four members of the Board shall be necessary to reverse any order, requirement, decision or determination of the Zoning Commissioner, or to decide in favor of the applicant on any matter upon which it is required to pass under this Article, or to effect any variation in this Article."

The appellants argue that the Zoning Commissioner has two kinds of duties under the Zoning Ordinance — (a) that of passing on applications for permits, that is, the reviewings of plans and proposals to determine their compliance with the ordinance, and (b) the enforcement of the ordinance when violations thereof actually have occurred. They say that since —as they read the ordinance—the appeal provisions do not spell out any particular vote as required for the Board on appeal from the Commissioner's action in passing on applications for permits, a simple majority vote in such cases will suffice and control. Only in case of action by the Commissioner in regard to existing violations, they contend, is a vote of four members required to overrule.

We think the meaning of the ordinance is plainly to the contrary.

Section 35 (h) says that in exercising the powers on appeal given by Sec. 35 (g), that is, in deciding appeals from any determination by the Commissioner "in the enforcement" of the ordinance, in deciding on special exceptions and in authorizing variances, the Board shall have "all the powers conferred upon the Zoning Commissioner" by the ordinance. Subsection (i) in terms specifies that the concurring vote of four members of the Board is necessary to reverse (a) "any order, requirement, decision or determination of the Commissioner"; (b) to decide in favor of an applicant on any matter upon which it is required to pass under the ordinance; or (c)

to affect any variation in the ordinance. As we see it, action which the Commissioner takes as to the granting of a permit is within the comprehension and coverage of the phrase *"any* order, requirement, decision or determination of the Commissioner" as used in Sec. 35 (i). (Emphasis supplied.) This view is reinforced by the provisions of Sec. 34 of the ordinance. That section is headed "Enforcement" and provides that the Commissioner—"head of the Bureau of Building Inspection"—shall not issue any permit for the construction of any building "unless the plans, specifications and intended use of such building * * * conform in all respects to the provisions of this Article." It further provides that if any building or structure is erected or constructed or used "in violation of this ordinance," the Commissioner "in addition to other remedies" may institute any appropriate action or proceedings to prevent, restrain or abate such violation. The section then continues that "if an application does not conform to the provisions of this ordinance, it shall be disapproved by the Zoning Commissioner."

The ordinance makes it apparent that it considers enforcement of its provisions and requirements by the Commissioner to include the passing on proposed structures and uses as well as the abatement and restraint of existing violations. Therefore, when Sec. 35 (i) says the concurring vote of four members of the Board is required to reverse any action of the Commissioner, it includes his action on an application for approval of a proposed structure or use.

On the merits of the case we agree with Judge Oppenheimer that the decisive question is one of law and that the project proposed by Relocation met the standards of Sec. 25-N and properly was approved by the Commissioner as a garden type apartment project and with his view that the reference in Sec. 25-N to central heating was a description of such structures as they existed at the time of the passage of the section, rather than a prerequisite necessary before a project could qualify as garden type apartments.

We adopt his opinion on the points as follows:

"In the consideration of the legal issues presented, it is

immaterial that the Developer is a non-profit company formed to carry out a national policy. The social and economic purposes for whose effectuation the Housing Act was enacted cannot control the interpretation of Baltimore's zoning law. New projects, whatever their genesis, can only be built in areas in which the contemplated structure does not conflict with the duly enacted provisions of local authority. Correlatively, it is beyond the province of the Court to consider whether a provision of the zoning law is wise or unwise, or whether the concepts of zoning which the law embodies are sound.

"Under Baltimore's zoning law, apartment houses can be erected in any residential area without any special permit or the granting of any exception if they do not violate the provisions as to density of population or height. The project of the Developer, insofar as density and height are concerned, is within the zoning requirements. Other provisions of the zoning law, however, would bar the structure, unless it is permitted under 25-N. Whether the project comes within this section, or whether, as the Appellants contend, it violates the section because it is in essence row housing, and because it does not contain central heating, requires consideration, not only of the terms of the law but also of its history.

"The nature of garden-type apartments has been considered in three opinions of the Court of Appeals, two of which preceded the enactment of 25-N. In *Akers v. Mayor & City Council of Baltimore,* 179 Md. 448 (1941), an application was made to the Building Engineer for a permit to construct six apartment houses, or groups of houses, on separate lots. There were to be 27 buildings containing over 100 families, in an E residential area. At that time, because of the requirements of the Zoning Code with respect to side and rear yards and other matters, the structures could not be erected without a special exception under what was then Paragraph 29 (c) but is now 32 (c) of the zoning law. The Building Engineer refused the permit but the Board of Zoning Appeals reversed. The Baltimore City Court affirmed the Board and the Court of Appeals affirmed the order of the lower Court. Chief Judge Bond, in delivering the opinion of the Court, referred to the

permits for the construction of six apartment houses or groups of houses, two stories in height, 'with the appearance of so many individual dwellings,' with each unit containing four apartments. He stated that the question was whether 'each structure of the several units combined is to be taken as a single building or as a group of buildings, so that the project is to be considered as one for the erection of twenty-seven buildings.' The Court held that each structure was to be taken as a single building. In its opinion, the Court stated that the proposal was to erect 'what are called garden type of apartments.' The Court said, at pages 451, 452:

"The ordinance does not deal with this type of apartment house specifically, and the arguments have pointed out resemblance to types some of which are permitted in such a district and some are not. It has some resemblance to the more familiar apartment house with several entries, the possession of which does not render the structure a violation of the ordinance. On the other hand it has resemblances to a connected row of houses, which would be restricted to other districts. The owner of houses built together in a row would hardly contend that they complied with the requirements in an E area if they had the requisite side yards only at the ends of the row.

'If these structural resemblances only should be regarded, the question of classification might be close, for the distinctions are slender. But when we consider the intended singleness in use and operation, and the facts that there is to be no letting of units, but only a letting of suites in them, that the six structures are to be owned and maintained by a single owner as six units, the buildings to be at the care of the owner, with conveniences supplied to all by him, exactly as with apartment houses of the more familiar, unbroken lines, the description of each group as an apartment house seems appropriate, as the Court below found. In the face of the unity in the use, the partial separation of the walls and the pos-

session of several entries proposed here is not enough to justify holding, in testing compliance with the ordinance, that there are twenty-seven apartment houses to be considered.'

"In *Norwood Improvement Association v. Mayor & City Council of Baltimore*, 191 Md. 155 (1948), an improvement association had appealed from a decision of the Baltimore City Court affirming a resolution of the Board of Municipal and Zoning Appeals approving an application for a permit to erect certain apartment buildings. The project comprised groups of two story units containing varying numbers of apartments. 34 units were grouped in 10 buildings and no lot lines were laid out on the project for the different buildings. The Court reversed on the ground that under the zoning ordinance, as it then existed, lots and buildings were the units of zoning and the whole development could not be regarded as one building. Judge Henderson and Chief Judge Marbury dissented. The opinion of the Court referred to the project as calling for 'a garden apartment development' and distinguished *Akers* in that there the project called for six buildings on separate lots.

"It was after the decision in *Norwood* that, in 1949, Section 25-N was enacted, expressly providing that in the apartment houses referred to, there need not be a separate lot for each structure or building, provided, *inter alia* the area of the project covered at least five acres.

"*Windsor Hills Improvement Association v. Mayor & City Council of Baltimore*, 195 Md. 383 (1950) was an appeal from an order of the Baltimore City Court affirming a decision of the Board approving a permit for the construction of three apartment houses, to contain nine units housing 45 families. The Court, in an opinion by Judge Markell, pointed out that what is now Section 25-N had been enacted after the decision in *Norwood* but that this section did not apply because the project covered less than five acres. The ground of appeal, as in *Akers*, was that the project was to be considered as comprising the erection of 9 buildings which were not parts of apartment houses but were row houses or the equivalent

thereof. The opinion stated that the proposed apartment houses are commonly known as 'garden type apartments.' The Court said, at page 390:

'In the opinion, by Chief Judge Bond, in the *Akers* case, 179 Md. at pages 450-452, 20 A. 2d 182-183, the resemblances of garden type apartments to row houses and to more familiar apartment houses are concisely compared, and the question of classification is found to be close if structural resemblances only were regarded, but clear when intended singleness in use and operation, and ownership, is considered. Appellants attempt to distinguish the *Akers* case on the facts, *e.g.,* in that case, "These units were planned to overlap and connect at the corners, leaving them separate fronts, sides and backs, except for the corner connections, where the foundation walls and roofs are to be continuous." 179 Md. 451, 20 A. 2d 182. In the instant case it is said that the units do not "connect at the corners," but are connected—and separated—at the sides by a solid wall, and that the roof lines are, for sake of appearance, broken. By the latter test presumably the House of the Seven Gables would be not one house but several. The former difference resembles the difference between two directly adjoining squares on a checkerboard and two diagonally adjoining squares actually used on the same board. We think that these and other structural differences are insignificant and that in intended singleness of use and operation, and ownership, this case and the *Akers* case are undistinguishable. Without repeating what was said in the *Akers* case or what is well said by Judge Niles in this case, we agree with him that 'there is no similarity to row houses which would support the contention of the appellants.' "

The Court dismissed the appeal as to the Association because, as a corporation, it had no standing, but affirmed the order as to Kairys, a taxpayer (and president of the Association) who had been granted leave to intervene as a party plaintiff.

"By its terms, 25-N includes 'Apartment houses designed and erected as a project with singleness of use and operation and with central heating and other facilities (commonly known as garden type apartments).' The significance of the reference to central heating will be considered hereafter but whether or not the project here involved is to be deemed a garden type apartment, or row housing, depends upon the language of the section with its necessary implication.

'That which necessarily is implied in a statute is as much a part of it as that which is expressed. 'In a broad sense, true implications are as much a part of the language which makes up the statute as the meanings of the various words are a part of it. Viewed from this standpoint, no exception is created to the general rule that the intent of the law-makers must be derived from the language used in the enactment.' " *Restivo v. Princeton Construction Co.,* 223 Md. at page 525.

"That the project here involved has the singleness of use and operation required by 25-N is beyond question. The structures are to be owned and maintained by a single entity, the Developer, who must maintain the exterior and interior of the dwelling units therein provided. The units can only be leased; they cannot be sold. The singleness of use inherent in the entire project is even greater than it was in the garden type apartments discussed in *Akers, Norwood* and *Windsor Hills.* Here, it is a condition of the leasing of each unit, in order to effectuate the purpose of the National Housing Act, that occupancy is to terminate if the income of the tenant rises above a certain amount.

"The descriptions of the garden type apartments discussed in the decisions of the Court of Appeals, as well as the specific requirements of 25-N with reference to the area of the project and the family per acre requirements, shed additional light on the phrase 'garden type.' What is clearly meant is that, in this type of apartment, the area for outdoor living and use is to be communal. The test is not the extent of side and front yards required for individual residences but the pro-

portion of the area of the entire project available to all the tenants. The area itself must be relatively large, over five acres. By other provisions of the law, not over 30% of the entire area can be built upon. It is of the essence of the conception of this type of structure that the area which cannot be built upon (which, in this case, is approximately 85% of the whole), shall be available for the common use of all the occupants, whether for recreation, parking of automobiles, or other communal purposes. This concept is in sharp and distinguishing contrast with the requirement of space for yards applicable to row houses.[1]

"The Appellants in their briefs analyze the distinctive structural characteristics of row houses. They point out that row houses are dwellings set in horizontal series with vertical separation of living units, each having its own front and rear entrance at street level, rarely exceeding two stories in height, and having the living areas and kitchen on the first floor, and bedrooms and bath on the second floor. They contend that the dwelling units in the proposed project have these as well as other characteristics of row houses, including separate facilities. They argue that, in view of these resemblances, the project consists, in fact, of row houses and that as row houses they violate the provisions of the zoning law applicable thereto.

"It is true that, in certain of the aspects referred to by the Appellants, the units here involved have a closer exterior and structural resemblance to row houses than did the projects

---

"1. Saylor's Dictionary of Architecture, John Wiley & Sons, Inc. (1952), at page 73, defines a garden apartment as 'a multiple dwelling of two or three stories in height, usually in a suburban residential community, with at least a minimum of landscaping on the site.'

"Webster's Third New International Dictionary, G. & C. Merriam Co. (1961) has the following definition:

'Garden Apartment
 1: a ground floor apartment whose rental includes the use of a garden.
 2: an apartment building enclosing a gardened court for the use of the tenants.' "

discussed in the decisions of the Court of Appeals. These resemblances, however, do not go to the two essentials of what constitutes a garden type apartment — the singleness of use and operation, and the joint use of the open areas.

"As to the exterior resemblance, Chief Judge Bond pointed out in *Akers* that, although each unit contained four apartments, the units had the appearance of so many individual dwellings. Clearly, the exact degree of resemblance was not deemed important. That the contemplated structure is only two stories in height is as consistent with the garden type of apartment house as it is with individual dwellings.[2] The structures called 'garden type apartments' by the Court of Appeals, in *Akers, Norwood* and *Windsor Hills,* were all two stories.

"The exterior of a structure does not necessarily indicate its true nature. The executive offices of the Prime Minister of Great Britain are located at 10 Downing Street, in a former seventeenth century private home. In Baltimore, as in other large cities, behind the gracious fronts of individual Victorian houses, warren apartments teem. With habitations, as with the persons they house, the facade is not necessarily determinative of the character.

"As to structural resemblance to row houses, the Appellants stress the fact that in some of the rental units in the project the bedroom quarters occupy the same space as do the living quarters below. It is also true, however, that in a number of units the bedroom quarters on the second floor interlock. The Appellants also emphasize that in the project, each unit has its own front and rear door, as do row houses. The planners of the project testified that this feature was designed to give the occupants a greater sense of privacy than they would have in other types of apartment houses. The number of en-

"2. Lewis Mumford, former Professor of City Planning at the University of Pennsylvania, regrets that many 'model' housing schemes for lower-income groups have departed from the low, shallow-house structure in which modern apartments were first established. Mumford, The City in History. Harcourt, Brace & World, Inc., (1961) pp. 433, 434."

trances in the structure, in my opinion, is no more conclusive as to its nature than, as Judge Markell remarked in *Windsor Hills,* was the number of projections on the roof of the House of the Seven Gables. It is also true, as the Appellants point out, that in the project, as in row houses, the living quarters are on the first floor and the bedrooms on the second. But a similar placement is sometimes found in the most luxurious types of apartment structures; incorporation of this arrangement in dwelling units for families of more modest means does not make the unit less of an apartment.

"As in *Akers,* if only the exterior and structural resemblances are to be regarded, the question of classification might be close, but, again as in *Akers,* when the intended singleness of use and operation are regarded, with the communal use of the outside spaces, it is clear, in my opinion, that in essence the contemplated units do not constitute row housing and that apart from the question of central heating, the project is a garden type apartment within the language and intent of 25-N.

"The Appellants contend that even though the project is held not to constitute row housing, nevertheless, it cannot be regarded as a garden type apartment under 25-N because it does not have central heating. They urge that the only specific feature named in the ordinance as a distinguishing characteristic of a garden type apartment house is central heating and that the units in the Developer's project have individual heating for each unit as contrasted with an apartment house with one plant which serves all the apartments.

"The units in the proposed project are gas furnaces, with a cooling coil and an air conditioning compressor and condenser unit. There is a separate gas heating appliance for each unit. The gas service for the entire development will come from the gas main in the public right of way to a service line that will traverse the project. From this source, each unit will be separately metered. The branch to each meter is from the gas line located on the Developer's property; none is individually metered from the main located in the public right of way.

"* * *

"Even though the heating method proposed for the project may be preferable to the former method, from the viewpoint of mechanical engineering and the comfort of the occupants, if this heating method eliminates the project from the apartment houses designated in 25-N, the provisions of the ordinance must control. The Appellees contend that the proposed heating units are, in reality, central heating; first, because each unit heats or cools the entire apartment, as contrasted with units for heating or cooling the individual rooms, and, second, because the gas is not supplied from the central main but from a service line in the Developer's own property.

"Assuming, however, without deciding, that the proposed heating system is not 'central heating' as that term is used in 25-N, in my opinion, the phrase in that section was used only to describe the garden type of apartment house at the time the section was enacted and was not meant to eliminate apartment houses from inclusion merely because a more modern or efficient method of heating might be developed.

"The structure of 25-N is first, the reference to garden type apartments designed and erected with singleness of use and operation; it is in connection with this phrase that the term 'central heating and other facilities' is used. Second, the section states that such apartment houses shall be permitted without providing for a separate lot for each structure or building involved in the project. Third, several express provisions or conditions are listed, including the area of the project, the density limitation and the provision that no building shall be constructed nearer than twenty feet from any other building. Neither central heating nor any other example of singleness of use or of operation is included in the provisos. The impact of the phrase is descriptive rather than limitational.

"As has been shown, 25-N was enacted after the *Norwood* decision. The manifest purpose of the Mayor and City Council was to eliminate the requirement for a separate lot for each structure, in the case of garden type apartments. *Norwood,* in using the phrase 'garden type of apartments,' referred to *Akers* in describing the garden type apartment under consideration. Chief Judge Bond, in *Akers,* used the phrases 'single-

ness in use and operation' and 'the building to be at the care of the owner, with conveniences supplied to all by him.' The history of the legislation and its place in the sections of the zoning law strongly indicate that the purpose of 25-N was to permit the erection of garden type apartments of the kind described in *Akers* without the lot restriction of the later case. As the Court of Appeals has pointed out, in construing a statute, the implication of the language is as much a part of the enactment as is the meaning of the various words. *Restivo v. Princeton Construction Co., supra.*[3] In the context of its history and the purpose for which it was enacted, 25-N's phrase, 'central heating and other facilities,' is to be taken as equivalent to the Court's phrase in *Akers* 'conveniences supplied to all.' In my opinion, it is not the implication of 25-N, nor its purpose, that the supplying of a greater convenience than was offered in the apartment houses of another decade was to eliminate a structure from the operation of this section.

"This has been the construction of the administrative office of the City charged with the application or enforcement of 25-N. In the last ten years they have uniformly held, in a number of cases, that a garden type apartment structure, which has heating of the kind contemplated for the project here considered, complies with 25-N.

"The Appellants contend that any thrust of this administrative practice is dulled by the fact that all of the approved structures, with one recent exception, were in areas in which row houses were permitted. However, as the Appellants themselves argue in another connection, if such structures are not within the scope of 25-N, they do not comply with the zoning requirements for row houses. It seems clear that the practice of the administrative authorities has been to approve edifices such as the one here involved as garden type apartments within the meaning of 25-N despite the fact that the heating arrangements have been individual units for each apartment.

---

"3. The judge 'must try as best he can to put into concrete form what * * * (the common) will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed.' Learned Hand, The Spirit of Liberty, p. 84 (1952)."

"No custom, however long and generally followed by administrative officials, can nullify the plain meaning and purpose of a statute. But where the language of a statute or ordinance is susceptible of two constructions, a long continued and unvarying construction applied by administrative officials is a persuasive influence in determining the judicial construction, and should not be disregarded except for the strongest and most urgent reasons. *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603, 615; *Sommers v. City of Baltimore,* 215 Md. 1, 5; Yokley *Zoning Law & Practice* (2d Ed.) Supp. p. 235.

"If the phrase 'central heating' in 25-N is only by way of reference or description to garden types of apartments as they were being built at the time the amendment was passed, rather than a limitation or condition, garden type apartments can be erected subject only to the express provisions set forth in the section, without preventing the use of new facilities for the increased comfort and convenience of the tenants. The point of difference between the majority and minority opinions in *Norwood* was removed by the enactment of 25-N; but Judge Henderson's discussion of the development of garden type apartments remains relevant. He said, at 191 Md. page 164:

'* * * To hold that the development of every tract must conform to the stereotyped conceptions of the era of the brown-stone front, puts an undue premium upon conventional design, and unduly limits architectural conceptions that attempt to meet the modern requirements of off-street parking, playgrounds and service facilities in common. The "garden-type" apartment design, like the university campus, should not be outlawed because it deals with the problem in an unconventional way.'

"In my judgment, the method of heating to be employed in the contemplated project does not remove it from the conception of the garden type apartment house contained in 25-N.
"* * *."

*Judgment affirmed, with costs.*