ROLAND PARK CIVIC LEAGUE ET AL. *v.*
LANCO, INC., ET AL.

[No. 179, September Term, 1964.]

*Decided March 5, 1965.*

The cause was argued before HAMMOND, HORNEY, MAR-
BURY, SYBERT and OPPENHEIMER, JJ.

*George W. Baker, Jr.,* with whom were *Allen, Burch & Baker* on the brief, for the appellants.

*Donald N. Rothman,* with whom were *Gordon, Feinblatt & Rothman, Joseph Allen, City Solicitor of Baltimore,* and *Harold I. Glaser* on the brief, for the appellees.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by Howard E. DeMuth, Jr. and others (the protestants) from an order of the Baltimore City Court sustaining the action of the Board of Municipal and Zoning Appeals (Zoning Board) in approving the issuance of a building permit for the construction of an eighty-two unit apartment building at the southeast corner of Roland Avenue and Cold Spring Lane.

Lanco, Inc. (the permittee) is the owner of a 16.7 acre lot or tract of land in a residential use district. In October 1962, the permittee submitted a subdivision plan for the lot to the Planning Commission. The Bureau of Surveys, in reviewing the plan, drew an east-west line across the northern portion of the lot which it designated as a "preliminary study line of Cold Spring Lane expansion." The line was drawn in connection with a study by the Director of Public Works of a proposed future widening of Cold Spring Lane east of Roland Avenue. The plan (with the study line marked thereon) was approved by the Planning Commission and from the subsequent issuance of a building permit the protestants appealed to the Zoning Board. The appeal and a suit to prevent construction were eventually dismissed but not until after the delay caused by those actions made it necessary for the permittee to seek and be granted an extension of the building construction completion date.

Thereafter, the permittee submitted a revised development and subdivision plan, along with an application for an amended permit, to the Planning Commission. This plan divided the tract into two lots, on one of which, containing 2.598 acres, the proposed apartment building was to be built. The balance of the 16.7 acre tract was reserved for future development. The amended plan, approved by the Planning Commission on Oc-

tober 8, 1963, also showed the study line but in this instance it was designated as the "proposed * * * [right of way] line for Cold Spring Lane expansion" by the permittee before the plan was submitted for approval. Other than the wording of the designation, the record does not indicate the meaning of the inscription.

The 2.598 acre lot, which is the subject of this controversy, consists of 2.04 acres situated in a D-1 area district (of which .307 acres is within the area designated for widening Cold Spring Lane) and .558 acres situated in an F-40 area district. The amended plan showed that substantially all of the adjacent parking spaces would be on F-40 land and that such land would also be used as entrances and exits to and from the parking area as well as to satisfy rear yard requirements. An elevation plan indicated that the apartment building would consist of a ground floor and six stories of a height of less than seventy-five feet. An amended building permit, allowing development of the subdivision as proposed in the amended plan, was issued on December 12, 1963, and the protestants appealed again. On the second appeal, the Zoning Board unanimously approved the action of the Zoning Commissioner in issuing the building permit. The action of the Zoning Board was affirmed by the lower court, and the appeal to this Court followed.

Three questions, all of which were decided in favor of the permittee below, are presented here: (i) whether that part of the D-1 land designated for widening Cold Spring Lane on the amended subdivision plan may be included in computing the allowable density; (ii) whether the areas required for parking spaces, entrances and exits, and the rear yard may be located on F-40 land; and (iii) whether the apartment building has more than six stories in violation of § 19-D of the zoning ordinance. No question as to a requested variance or special exception is involved.

(i)

In addition to questioning the applicability of § 31-L of the city zoning ordinance to tracts of land other than garden apartment lots, the protestants, relying on *Akers v. City of Baltimore,* 179 Md. 448, 20 A. 2d 181 (1941) and *Clarks Lane*

*Garden Apts. v. Schloss,* 197 Md. 457, 79 A. 2d 538 (1951), contend that the D-1 land, exclusive of the .307 acres on the northerly side of the line designated as "proposed right of way" on the amended plan would support a density of only sixty-nine dwelling units as opposed to the eighty-two authorized by the building permit.

Section 31-L provides that:

> "In determining the number of families which may
> be housed on a lot or tract of land under sub-section
> A of Section 25 [concerning the method of arriving at
> the maximum number of families per acre which may
> be housed on any lot] and in determining whether or
> not a tract of land contains five acres under sub-section
> N of Section 25 [concerning apartment houses com-
> monly known as garden type of apartments], the area
> of land designated on an approved sub-division plat
> * * * and thereby or thereafter given or dedicated to
> the [City] by the owner, for the purpose of widening
> a street or alley abutting the lot or tract involved,
> shall be included in the area of such lot or tract of
> land."

In *Akers,* where the Planning Commission approved a proposed subdivision for the construction of six groups of apartment houses on condition that two adjacent public highways be widened by a taking from the property to be developed and the owner agreed to provide for the widening and to reduce the density of the area accordingly, the issuance of a permit for the project as adjusted was granted and the order therefor was affirmed.

In *Clarks Lane,* where the question presented was whether the area reserved in a subdivision plan for streets to be thereafter acquired by the city could be included in calculating the area requirements for garden apartments, it was held that the area of the proposed streets could not be included as a part of the project. It is to be noted, however, that there was evidence in that case, not present in this, that the Planning Commission had required reservation of streets before approving the subdivision plan with the understanding that they would be paved and opened without delay.

In the case at bar, the claim of the protestants, admittedly based on their assumption that § 31-L applies to garden apartments only and their theory of the effect of the permittee having designated the "preliminary study line" on the original plan as the "proposed right of way line" on the amended plan, is that the designated area acquired official status as a part of the street when the amended plan was approved by the Planning Commission and that such area (whether or not presently used as a street) cannot be included in computing density. As we see it, however, it would be just as feasible to have surmised that the permittee, by substituting "proposed" right of way line for "preliminary" study line thereby intended to give or dedicate the land in question to the City, whenever the proposed widening became a reality.[1]

But regardless of whether or not § 31-L can be construed as applying to other lots as well as garden apartment lots, and regardless of the decisions of this Court in *Akers* and *Clarks Lane,* we think the facts and circumstances of this case do not require a finding that the portion of D-1 land on the northerly side of the "proposed right of way" line cannot be used in computing density. Rather, we think the record supports the finding of the lower court that the designated line was nothing more than a tentative proposal or study line and was too indefinite to classify the area in question as a part of the street either in fact or in law. The line drawn by the Bureau of Surveys as a "preliminary study line" on the original subdivision plan is a clear indication that whatever widening of Cold Spring Lane was then planned was only contemplative and nothing has been done by the City since to make the proposed widening more definite. Moreover, although the Department of Public Works has apparently been engaged for some time in planning for the expansion of Cold Spring Lane, there is nothing in the record to indicate when, if ever, a widening will take place. No defini-

---

1. While no positive evidence was offered, the lower court was informed, as we were at the oral argument, that it was the present intention of the permittee to give the "proposed right of way" to the City and not require condemnation when the widening line of Cold Spring Lane becomes definitely fixed.

tive action has been taken by the City as of now indicating that an expansion of the street will follow a predetermined course or include land belonging to the permittee. Nor has any ordinance ever authorized the widening of the street or the acquisition of land for that purpose by condemnation or otherwise either from the permittee or other abutting owners.

While § 119 of the Charter of Baltimore City provides that streets in a subdivision plan, after the approval of the plan by the Planning Commission, shall have the status of a street shown on an official detailed plan, § 114 (of the charter), concerning the effect of an official detailed plan, states that the adoption of such a plan shall not be deemed the opening or establishment of a street but shall merely designate the location thereof for future acquisition for public use. And in *Feldman v. Star Homes,* 199 Md. 1, 84 A. 2d 903 (1951), the approval of a subdivision plan was said not to alter the character of *proposed* streets nor to require the city to take them over. Under some circumstances the approval of a subdivision plan, under which certain areas are set aside for future streets or the widening of existing streets, as was the situation in the *Akers* and *Clarks Lane* cases, may prevent the use of the land so acquired in computing the density permitted in the area involved. But where, as here, the permittee without having been required to do so as a condition precedent, accepted a preliminary study line as the proposed right of way line for the widening of a street on which its property abutted, we hold that the subsequent approval of the overall subdivision plan by the Planning Commission does not require a finding, as a matter of law, that a widened street existed.

(ii)

Section 17-A of the zoning ordinance requires that parking spaces be provided on the same lot on which a dwelling is erected or on a lot not over three hundred feet from the dwelling. There is, however, no provision expressly prohibiting the use of one area district for the parking requirements of another area district. Furthermore, since it is with buildings that the density provisions of the zoning ordinance are principally concerned, parking space on the same lot as the building or any other lot

is generally regarded as open or unoccupied space. *Windsor Hills Improvement Association v. City of Baltimore*, 195 Md. 383, 73 A. 2d 531 (1950); *Akers v. City of Baltimore, supra.* Where, as here, two distinct area districts are within the same residential use district, it would not be improper to provide for the parking requirements of the residents of one area district in an adjacent area district. In *Hutzler v. City of Baltimore*, 207 Md. 424, 114 A. 2d 608 (1955), where a somewhat analogous problem was presented in that there were two separate height districts in a lot situated in the same use district, we held that rear yard requirements could be satisfied in a height district distinct from that in which the building was located. And in *Akers v. City of Baltimore, supra,* it was held that there was no restriction in the zoning ordinance against parking cars in the spaces required for yards.

Although in the present case the parking spaces and the building are in different area districts, it is with the regulation of population density that area districts are concerned. And while there may be a direct relationship between density and parking —in a case such as this where both area districts are in the same residential use district and it is deemed desirable to maintain an orderly neighborhood therein—we see no reason why parking space for an apartment building should not be allowed in an adjacent lesser density area than the building which it serves.

The reasons stated for holding that parking spaces may be provided on F-40 land for residents of D-1 land also disposes of the questions as to the entrances and exits and rear yard requirements.

(iii)

Section 19-D of the zoning ordinance provides that "in a one time height district * * * dwellings shall be * * * limited in height to * * * six stories, not exceeding seventy-five feet." While the building in question does not exceed seventy-five feet, the protestants contend that because the apartment consists of a ground floor and six stories, it is in fact a seven story structure in violation of § 19-D. The zoning ordinance does not delimit or define the meaning of the word "story," but it

was shown that it has been the practice of the Zoning Commissioner not to consider a ground floor as a story in computing the number of stories if that level was partially below ground and no dwelling units were to be maintained therein. Here, there was evidence that a substantial portion of the level in question was underground, that the level, except for fifteen per centum of its area, was unfinished, and that no part of the level would be used as dwelling units. The Zoning Board accordingly determined that the lower or ground floor of the building should not be construed as a story in calculating the permitted over-all height. On the facts presented, we think the action of the Zoning Board was not improper, and we so hold.

For the reasons stated, the order of the lower court sustaining the action of the Zoning Board will be affirmed.

*Order affirmed; the appellants to pay the costs.*