## C. E. WEAVER STONE CO. *v.* COMPTROLLER OF THE TREASURY, STATE OF MARYLAND

[No. 324, September Term, 1963.]

16

*Decided May 6, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, MARBURY and SYBERT, JJ.

*John T. Enoch,* with whom were *Goodman, Meagher & Enoch* on the brief, for appellant.

*Robert J. Martineau, Assistant Attorney General,* and *Edward F. Engelbert, Chief, Retail Sales Tax Division,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

The Circuit Court for Baltimore County affirmed a ruling of the Retail Sales Tax Division of the Comptroller, which denied a claim for a refund of sales taxes paid and rejected a protest of an assessment of additional sales taxes, and the taxpayer has appealed, posing three questions:

18

1. Are the charges for reducing the size of stone slabs from a large, irregular size to a smaller size of uniform thickness for sale as building stone a part of the price of such stone on which the tax is to be computed, or are they charges for installing such stone?

2. Is the quarrying and selling of building stone subject to the sales tax either as the retail sale of tangible personal property not otherwise exempt from the act or as the production of tangible personal property on special order for a consideration?

3. Under the circumstances in this case, is the Comptroller estopped from assessing and collecting the tax because of statements made to an agent of the appellant by an employee of the Retail Sales Tax Division?

The appellant, The C. E. Weaver Stone Company, is engaged in the business of quarrying and selling building stone from a quarry not owned by it. Weaver's operation consists of blasting the stone from the quarry face, reducing the resulting boulders into what is known as "broken face" stone, that is, slab sizes which may be handled conveniently by one or two men; further processing some of the "broken face" stone to a wall thickness (most such thicknesses being 8″), which product is known as "Chesapeake Hue"; and selling and delivering the "broken face" and "Chesapeake Hue" stone (as well as other kinds and grades of stone) to contractors, builders and other users. Prior to 1951, "Chesapeake Hue" stone was not part of Weaver's product line, and the reduction of "broken face" stone to wall thickness was done by masons on the job sites. The work was performed immediately prior to installation and was a preparation for installation. The masons did this work although, in some instances, Weaver had to send men to job sites to break down further the stone to get it ready for the wall. Weaver now has no masons and has no contact with the mechanical process of picking stone up and placing it in the wall.

In 1951, Weaver secured a machine known as a "guillotine," the purpose of which was to slice or cut the "broken face" stone at the quarry site into more uniform thicknesses. To some degree, the machine does what was formerly done at the construction

site. The entire function of the machine is to break the stone in a fairly straight fashion. After the installation of the guillotine, Weaver continued to sell "broken face" stone.

The demand for "Chesapeake Hue" stone has been so great that it is practically sold immediately after the processing takes place. Only in winter, when Weaver's men are unable to make delivery on the job, is the stone stocked for delivery in the spring.

Guy S. Tregoe, Jr., was employed as an accountant by Weaver, from June, 1946, through June, 1955. He has been an accountant for 20 years. In March of 1951 when Weaver first purchased the guillotine, Tregoe had some question concerning how the Retail Sales Act would apply to the product of the machine. He wanted to know how to handle the processing charge. When the "broken face" stone was run through the machine, there was a certain cost involved in labor and this was the processing charge. Tregoe prepared an invoice at the time on which the cost of the stone was separated from the cost of processing. The customer was not charged a sales tax on the cost of processing. Prior to setting up the invoice, Tregoe had a discussion with a Mr. Stewart, from the Retail Sales Tax Division, concerning the setting up of the invoice. Tregoe showed Stewart how he planned to revise the invoice to take care of this processing charge and was told by Stewart that as long as Weaver was segregating the different component parts of the invoice, he did not see why it was not satisfactory to continue on that basis. With that answer from Stewart, Tregoe proceeded to revise the corporation invoices, and thereafter based the sales tax strictly on the sales value of the stone and not the delivery or processing charge. Since 1951, the tax has been collected and paid in this manner.

In 1951, Stewart was employed by the Retail Sales Tax Division as an investigator assigned to Baltimore County. Tregoe saw him at a desk in the Retail Sales Office, then located on Hopkins Place, when Tregoe went there on other business. Tregoe didn't know Stewart's capacity, other than that he was an employee of the Sales Tax Division. He didn't know at the time that the Division had a group of lawyers working for it that gave legal opinions concerning tax matters. He did not

seek the advice of any other member of the staff. The duties of an investigator were to examine the records of tax payers to make certain that they had paid the full tax which was due to the State of Maryland and to report his findings to his superior. All field men are specifically prohibited from giving legal interpretations. A special staff was provided to do this. When asked legal questions, field representatives are directed to present them to the main office for replies. The Chief of the Sales Tax Division knows of no conversation between Stewart and Tregoe concerning this matter.

On June 1, 1954, Mr. Engelbert, the then Assistant Director of the Retail Sales Tax Division, wrote a memorandum and mailed it to every holder of a sales tax license. As of that date, Weaver was the holder of a sales tax license and it should have been (and probably was) mailed to Weaver with its monthly sales tax return. In the normal course of business, Tregoe got communications regarding sales tax matters. He couldn't say that he received the letter from Engelbert. Letters of this nature are sent out to inform the tax payers of the provisions of the law in respect to the subject matters covered by the memorandums, and are usually triggered by the fact that field men have picked up transactions of that particular type on which the tax has not been properly assessed. Confusion on the part of tax payers is one of the reasons for sending out such letters.

## I

Appellant's position here is that the work now performed by the guillotine was formerly done at the construction site by masons employed by the purchaser. It argues that when the work was so performed, the cost thereof "could not be considered other than an expense of installation.[1]" It states that the

---

1. Code (1957), Article 81, Section 324 (i), in pertinent part, provides:

"(i) 'Price' means the aggregate value in money of any thing * * * paid * * * by a purchaser to a vendor in the consummation * * * of a retail sale without any deduction therefrom on account of * * * labor or service cost, or any other expense whatsoever. * * *. 'Price' shall not include * * *:

(1) The consideration received for labor or services used in installing, applying, remodeling or repairing the property sold * * *."

"guillotining operation is one which prepares the stone for installation," and claims the "guillotining process" is basically an "installation or an application," and therefore the consideration received by the appellant for it comes within the exception to "price" named in the statute. We are unable to agree.

We see no need to elaborate upon the proposition unduly. The facts simply disclose that Weaver sells several different kinds and grades of stone, among them being "broken face," or rough, stone, and "Chesapeake Hue," which is a trimmed or finished stone. The price received by Weaver for "Chesapeake Hue" is for the finished product, and the cost of the guillotining process is a part of the cost of that finished product, just as the cost of blasting is a part thereof (and a part of the cost of the "broken face" stone). Preparing for installation is not the same as installing. We hold that the trial judge was correct in his ruling on this question.

## II

Appellant's second contention is based upon Code (1957), Article 81, Section 324 (f) (2), and Rule 81 of the Comptroller. Section 324 (f) (2) provides that "any production, fabrication, or printing of tangible personal property *on special order for a consideration* [italics ours] is included in the terms "retail sale" or "sale at retail," and therefore taxable under The Sales Tax Act. Rule 81 is entitled "Fabrication and Production," and it interprets and explains (at least in part) the above quoted portion of Section 324 (f) (2). The Rule states that if labor be expended in producing a new item, the tax must be charged on the full selling price, but if labor be expended "in repairing or altering existing property belonging to another to restore the item to its original condition, or usefulness, the tax does not apply to the labor." Appellant says that since no new item is produced by its stonecutting process, no tax can be claimed by the State for the cost of the labor expended in said process, under the interpretation given to Section 324 (f) (2) by Rule 81.

This proposition cannot be sustained for several reasons; we shall name two. First, the argument completely overlooks the phrase "on special order for a consideration" in both Section

324 (f) (2) and Rule 81. The Section has no application to appellant's business, because it does not sell its products "on special order for a consideration." It handles and sells, as stated above, several kinds of stone. Contractors, builders and land owners order the kind and grade they want at will. And there is no contention that the guillotining is "repairing or altering existing property belonging to another to restore the item to its original condition" as provided in Rule 81. Second, Section 324 (f) (3) specifically provides that "sale at retail" shall include the sale of tangible personal property to contractors, builders or landowners for use or resale in the form of real estate. This section, we think, clearly covers the sale of "Chesapeake Hue" by Weaver.

### III

Under this heading, appellant claims the State is estopped from assessing and collecting the tax because of "misrepresentations" made by an "agent" of the Comptroller. A complete answer to this contention is contained in our recent decision in *Comptroller v. Atlas General Industries,* 234 Md. 77. See also Wagner, "Estoppel by Informal Administrative Action or Opinion in Sales and Use Tax Cases," 64 Dickinson L. Rev. 47, and the annotation in 1 A.L.R. 2d 338.

However in fairness to the Comptroller, we note that in this case the advice allegedly given to appellant's accountant was obtained by the accountant in a most casual and informal manner from a man whose "capacity" was unknown to him, and who, as a matter of fact, was specifically ordered not to give legal opinions. In addition, on June 1, 1954, six months prior to the beginning of the period of assessment involved herein, Mr. Engelbert, as noted above, wrote a memorandum explaining Rule 81, and mailed it to every holder of such a license. The memorandum concluded, "If you have any difficulty with this matter [when the cost of labor expended on fabrication and production of property on a special order for a consideration is to be included in sales at retail], please get in touch with the undersigned who will make every effort to clarify it for you." After ignoring this written invitation to attempt to clarify all aspects of the question of the cost of labor in the production

of tangible personal property for sale, appellant is scarcely in a position to complain that he relied upon an informal oral opinion of some minor employee of the Comptroller's office.

*Order affirmed, with costs.*