ROCKOWER BROTHERS, INC., ET AL. *v.* COMP-
TROLLER OF THE TREASURY, STATE
OF MARYLAND

[No. 469, September Term, 1964.]

380

382

*Decided November 10, 1965.*

*Dissenting opinion filed December 7, 1965.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY and BARNES, JJ.

*Lawrence F. Rodowsky* and *John W. Frommer, Jr.,* with whom were *Dilworth, Paxson, Kalish, Kohn & Dilks,* and *Frank, Bernstein, Conaway, Gump & Kaufman* on the brief, for appellants.

*Robert J. Martineau, Assistant Attorney General* and *Edward F. Engelbert, Chief, Retail Sales Tax Division,* with whom were *Thomas B. Finan, Attorney General,* on the brief, for appellees.

HAMMOND, J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 394, *infra.*

At issue is the liability to the State for sales taxes of a corporation, Rockower Brothers, Inc., which sold its merchandise anonymously from leased space in discount department stores owned by Towers Mart International which, to all outward appearances, was the vendor and which had collected the taxes for Rockower but had not paid them over to the State. Taxes for the period from December 1, 1962 to January 31, 1963 in the amount of $18,246.81 and for the first two days of February 1963 in the amount of $312.18 are involved.

The facts are agreed to. Beginning in 1959 Towers operated discount department stores in various locations — usually in shopping centers—in Maryland. Its method of operation was

to lease space in a store to concessionaire companies, each of which anonymously sold its particular variety of merchandise— for example, men's clothing, household furnishings, children's things, women's dresses—from the department space allotted to it under the lease. As far as the general and shopping public were concerned, only Towers ran the store and sold the merchandise since the store buildings were marked "Towers," newspaper and other advertising was in the name of Towers and the wrapping paper, bags and other accessories, although paid for by the concessionaires, bore the label "Towers." A shopper would go from department to department and counter to counter, selecting merchandise which seemingly was that of Towers but actually was the property of the concessionaire (licensee) which was leasing that department or counter.[1]

Each concessionaire offered its merchandise to the public through sales persons employed by it; other employees placed on display fresh merchandise they brought out from warehouse stocks maintained by it.[2]

When a shopper was ready to leave the store with his purchases, he went to a check-out cashier (as in a chain grocery

---

1. The written agreement between Towers and each licensee provided that the "LICENSEE shall purchase its merchandise for its department and for its own account. * * * in its own name and on its own credit, and [it] shall be paid for directly by LICENSEE, and LICENSEE agrees not to pledge the credit of LICENSOR [Towers]. [N]othing in this Agreement shall in any way be construed to constitute a co-partnership or joint venture * * *."

2. The standard agreement provided:
"LICENSEE shall continuously conduct a retail business as above in said department in said store during the period of this agreement. LICENSEE shall maintain a full and complete line of new, seasonable, representative and saleable merchandise which shall be of such variety, size and character as to meet the demand of the store trade * * *.
* * *
"LICENSEE shall furnish and engage qualified and competent employees for the conduct of said department. All persons employed in and about or in connection with said business * * * shall be * * * recognized to be employees of LICENSEE * * *."

store), who was an employee of Towers. The cashier rang the various purchases on the cash register, which had a separate key for each concessionaire. The sales tax was computed and collected on the total purchase price of the merchandise presented by each customer.[3]

A licensee paid Towers seven and one-half per cent of sales plus three per cent to be expended for advertising purposes. Towers was to deposit each day to the credit of the licensee in its bank account eighty-nine and one-half per cent of that licensee's gross sales. It was agreed that "LICENSEE shall pay all the taxes assessed by any taxing authority on the merchandise carried in said department * * * including but not limited

---

3. The agreement provided:

"All monies from sales of merchandise in or emanating from said department shall be paid directly to and handled by LICENSOR'S cashiers, and a separate and distinct account shall be kept by LICENSOR of all such monies by means of a separate key on LICENSOR'S cash registers to identify all sales of merchandise in said department. LICENSEE agrees that the receipts (including checks accepted by LICENSOR) from the operation of said department to be conducted by LICENSEE, shall go through the regular channels of the business of LICENSOR, according to its usual and ordinary methods of doing business, in the same manner as sales made by LICENSOR for its account in its general business, and shall be deposited daily in the account which the LICENSEE maintains in a bank designated by LICENSOR, less 10½%, subject to payment as herein provided. LICENSOR shall furnish to LICENSEE not later than Friday of each week during the term of this license, a statement of all such deposits and charges, together with duplicate deposit slips, for the preceding calendar week ending the preceding Saturday. LICENSOR shall deduct from the next succeeding daily deposit or deposits any sums due from the LICENSEE to the LICENSOR as rental over the guaranteed minimum rental, the amount of any credits for merchandise returned by customers, and the amount of any and all other charges against LICENSEE'S account made by LICENSOR in accordance with the terms of this license. At the time of the rendition of said statement, LICENSOR shall deposit to the account of LICENSEE, as provided above, the balance due to LICENSEE thereunder after said deductions, if any."

to sales taxes of the State of Maryland * * *." The monies which Towers collected as sales taxes were retained by it until paid over to the State and it took the two per cent of those monies remitted as allowed by Code (Supp. 1965), Art. 81, §338, to a remitting vendor.

When Towers began operating in Maryland in 1959 it registered with the Comptroller and obtained a sales tax license as vendor for each of its locations. It filed sales tax reports and remitted sales taxes on a consolidated basis in its name without revealing either the fact that the sales were in fact those of merchandise belonging to concessionaires or the identity of the concessionaires. An auditor of the sales tax division testified that he had always realized that Towers operated on the leased departments system but that for some time he was unable, despite continual effort, to determine the identity of the lessees or to obtain registration from any.

The chief of the sales tax division said he was not originally aware that Towers operated through leased departments or that it was filing a consolidated return. When the matter came to his attention, an effort was made to have the concessionaires register. When asked if his office had agreed that Towers could continue to file and pay as it had, he testified: "Let me say it this way: * * * [Towers] assumed the authority to file and began filing that way. When the account was called to my attention, I did nothing to prevent them from so filing. I have no agreement with them or no formal understanding."

In December 1960 Towers failed to timely pay over the taxes it had collected. The Comptroller's office attempted to obtain a bond from Towers but then accepted its assurance that it would pay promptly thereafter. Rockower, operating through wholly owned corporate subsidiaries, began leasing the men's wear departments in Towers stores in Maryland in February 1961 and by the time of the assessments here involved was leasing in eight Towers stores. Rockower Bros.-Md. Corp. ran the men's wear departments at Dundalk, Brooklyn Park, Langley Park, Wheaton, and Liberty Road; Rockower-71 Corp. at Timonium; Rockower-78 Corp. at Suitland, and Rockower-Carrollton at Carrollton.

When Rockower first entered the Towers stores in early

1961, Towers sent it a sales tax registration form, requesting that it be completed and returned to Towers. Towers informed Rockower that it would take care of any necessary dealings with the Comptroller, including any registration required of Rockower, as well as that the Comptroller was accepting regularly a single master sales tax return. Rockower did not check the veracity or accuracy of this information. Later, however, Rockower did register for several locations because Towers requested it do so; it did not so register (prior to the assessments here involved) unless Towers asked it to. Rockower-Carrollton filed a registration application for its operation dated March 28, 1962. A note at the bottom (not on it when it was filed) stated: "Towers will remit sales tax * * *. B. C. L. [the initials of an auditor in the sales tax division]." Similar applications were sent in by Rockower-71 Corp. and Rockower-78 Corp. in mid 1962. Sales tax report forms were filed by the 78 Corp. for September through December 1962 and for the 71 Corp. for November 1962 through February 1963. No sales were reported and no taxes remitted by either corporation; the reports bore only the notation "all taxes collected and remitted by Towers."

As it had from time to time previously (the earlier delays were explained as caused by problems of rapid growth), Towers was late in December in paying Rockower the eighty-nine and one-half per cent of gross sales which it owed it and toward the end of January 1963 Rockower got Towers to agree to adhere to the provisions of the agreement between them for daily payments.

Unknown to Rockower, Towers did not pay over to the Comptroller the sales taxes it had collected in December 1962. Rockower, in the words of the agreed statement of facts, "* * * made no attempt to see that these sales taxes were remitted to the State because Rockower believed that Towers had paid the sales taxes since they were trust funds in the hands of Towers."

Rockower learned definitely that Towers was in financial difficulty early in February 1963, after the periods covered by the assessments here involved but before these assessments had been made. Rockower obtained a court order in New York on February 28, 1963 which directed Towers and a creditors' committee for Towers to turn over to Rockower all "receipts" from

sales of its merchandise (defined as including sales taxes) theretofore received and to deposit all Rockower "receipts" thereafter received in a Rockower bank account on a daily basis. From March 1, 1963 on, Rockower filed with and paid sales taxes to the Comptroller, as a vendor in each of its Maryland operations. Rockower recovered some $300,000 owed it by Towers for the period from December 1, 1962 to February 2, 1963 but could not obtain an additional $218,495.25 which Towers owed it for that period.

When the Comptroller discovered that Towers had not filed a report for December 1962, he demanded immediate payment of the taxes due, and ascertained the amount of sales for December 1962 and January 1963 and a list of the concessionaires at each Towers store. On February 28, 1963 the Comptroller made an assessment against "Rockower Bros. (Towers)" for sales taxes of $18,246.81 plus penalty of $5,645.44 and interest of $167.63, or a total of $24,059.88. Attached to the assessment was a worksheet which showed the sales taxes claimed to be due for each of the eight Towers stores at which Rockower leased men's wear departments. There followed a supplementary assessment directed to "Rockower Brothers," dated April 2, 1963 for the days of February first and second, 1963, in the amount of $312.18, plus penalty of $31.23 and interest of $1.56, or a total of $344.97. Rockower made timely protests to both assessments, raising substantive and procedural grounds of defense, including the claims that there was no such taxpayer and that subsidiaries of Rockower not named in the assessments operated leased departments in Maryland.

On April 15, 1963 the Comptroller filed a lien in the Circuit Court for Baltimore County against "Rockower Bros. Md. Corporation," the corporation which operated in the Towers stores at Dundalk, Brooklyn Park, Langley Park, Wheaton, and Liberty Road, in the amount of $24,404.85. On the same day the Comptroller filed in the same court a lien against Rockower Bros.-71 Corporation, which operated at Timonium, for the same amount. Writs of *fi fa* were issued under each of the liens and execution was made on goods of Rockower-71 Corp. at the store of Towers in Timonium which was then the only Towers store open.

On May 2, 1963, in order to obtain release of its merchandise and the liens (including another which had been filed in Montgomery County), Rockower paid the total amount of the sales tax claimed—$18,558.99, after the Comptroller waived penalties of $5,676.67 and interest of $169.19 and agreed to consider the protests of Rockower, previously filed, as claims for refund.

After a hearing, the Comptroller denied the refund and on appeal to the Circuit Court for Baltimore County Judge Turnbull affirmed for the reasons given in the opinion of the hearing officer of the Comptroller.

Rockower argues (1) that under the Retail Sales Tax Act Towers, not Rockower, was a vendor liable under the law for the collection and payment over to the Comptroller of sales taxes; (2) that if it be assumed that Rockower was a vendor, it was an involuntary trustee of the tax funds collected (Code (1957), Art. 81, §327, says in part "the tax shall be paid by the purchaser to the vendor as trustee for and on account of the State * * *") and that as a trustee it is not an insurer or guarantor and is liable only for failure to exercise ordinary care and that it did not so fail; and (3) that the Comptroller should not be permitted to retain funds obtained as the result of assessment and collection procedures which violated the statutes.

We think Rockower was a vendor. Code (Supp. 1965), Art. 81, §324 (b), defines a vendor as "* * * any person selling property or rendering services upon the sale of which a tax is imposed under §325 of this subtitle." Section 324 (d) of Art. 81 defines "sale and selling" to mean "* * * any transaction whereby title or possession, or both, of tangible personal property is or is to be transferred by any means whatsoever for a consideration * * *." Rockower argues that in the relationship that existed Towers was the vendor because "* * * the right to possession and title to the goods passed to the purchaser at the time payment was made by the purchaser to Towers, at Towers' cash registers manned by Towers' employees." Assuming that neither title nor possession was transferred to a purchaser until Towers collected the purchase price at the checkout counter, Rockower's argument merely confuses the time of

passage of possession and title with the entity which makes the transfer. Towers was only a collecting agent for Rockower. Under paragraph one of the agreement between them, Rockower is leased space "for the sale at retail" of men's wear. Another provision of the agreement is that Rockower shall purchase for its own account and on its own credit the merchandise it sells, and another provision is that Rockower shall use its own personnel to make the sales. The agreement defines "net sales" of Rockower to mean the "* * * total amount charged by the Licensee in connection with any and all sales of merchandise and service to patrons and customers * * *." Paragraph 4 of the agreement refers to monies "* * * from sales of merchandise in or emanating from said [licensee's] department * * *." Paragraph 6 states that Rockower is to be liable for and pay Maryland sales taxes. In paragraph 12 Rockower agrees to sell to all at one price and to "* * * sell its merchandise at a retail price as low or lower than substantially comparable merchandise sold in retail stores within a radius of twenty-five (25) miles of the LICENSOR's store * * *."

It is clear that although Towers' employees collected the purchase price of merchandise which Rockower sold, Towers never had either title or possession to transfer to a purchaser. When the merchandise which Rockower handled was on the counters and shelves in its alloted leased space in the Towers store, it was in Rockower's possession and Rockower owned it. When a customer selected some of the merchandise to buy, it passed to his provisional possession for as long as he remained in the store and when he paid for it at the check-out counter, title and final possession passed from Rockower to unite in the customer. Towers did no more than afford Rockower a place and an opportunity to makes sales and, as its agent, collect the purchase price and the sales tax due on the price.

Rockower says that because the Comptroller allowed Towers to make returns of and pay sales taxes on all sales made in its stores Towers was the vendor in all such sales, particularly because (a) the Comptroller sought a bond from Towers; (b) he permitted it to deduct the two per cent of sales tax collections allowed to vendors for collecting and paying over those taxes; (c) he permitted Towers to collect sales taxes on the

aggregate amount of sales; (d) he accepted payment of sales taxes from Towers creditors' committee for the period from February 2 to February 28, 1963; (e) only Towers collected sales taxes from purchasers—not Rockower—and only one who actually collects sales taxes has a trust res to hold, under the statute, "as trustee for and on account of the State"; and finally (f) Rule 66 of the Comptroller, that "every factor * * * or agent acting for any principal * * * or entrusted with possession of any personal property for the purpose of sale shall be responsible for the proper collection and remittance of the tax with respect to such sales * * *."

We see the answer to these contentions to be that the law clearly makes Rockower the vendor in the situation and environment here involved, and the fact that the Comptroller, although realizing that Towers was an agent of various actual vendors, allowed it to file sales tax returns and pay the tax as a de facto vendor cannot estop the State from later asserting Rockower's actual status as a vendor under the statutes.[4] As a vendor, Rockower is liable for taxes collected but not paid over by its agent.

> "The State in collecting its taxes acts in a governmental, and not in a proprietary capacity.
>
> * * *
>
> "It seems to be universally recognized that, generally, a State cannot be estopped by the acts and conduct of its officers or agents in the performance of the governmental function of collecting taxes legally due. The reason for the rule is obvious: no administrative officer is vested with the power to abrogate the statute law of the State, nor to grant to an individual an exemption from the general operation of the law." *Comptroller v. Atlas Industries,* 234 Md. 77, 84.

See also *C. E. Weaver v. Comptroller,* 235 Md. 15, 22. The Comptroller's Rule 66 is not intended to transfer the liability

---

4. We are not to be understood as approving or disapproving the action of the Comptroller in allowing Towers to treat all purchases by one customer in the same store as sales made by the same vendor.

imposed by statute on a vendor to an agent of a vendor—and if it was so intended it would be invalid as beyond the power of the Comptroller to promulgate—but merely to supplement the legal liability of a vendor by imposing an additional liability upon a vendor's agent.

We turn to Rockower's contention that if it is held to have been a vendor it was an involuntary trustee whose liability is only to exercise due care, and that in the selection and retention of its agent (Towers) with respect to the taxes collected by Towers, it did exercise due care. We see obvious factual flaws in this proposition but since we think the statutes impose an absolute liability on a vendor to collect and pay over to the State the proper sales taxes, there is no need to detail them.

Code (1957), Art. 81, §327 provides that the sales tax on each taxable event shall be stated and charged separately from the price and a separate record of the tax kept, and then concludes: "The tax shall be paid by the purchaser to the vendor as trustee for and on account of the State, and the vendor shall be liable for the collection thereof for and on account of the State." Section 328 then provides that:

> "the vendor and any officer of any corporate vendor shall be personally liable for the tax collected or required to be collected under this subtitle * * *. Any vendor who fails to collect the tax, and any officer of a corporate vendor which fails to collect the tax * * * shall, in addition to all other penalties, be personally liable to the State for the amount uncollected."

Rockower's argument is that the liability of a vendor or an officer of a corporate vendor is only that of an involuntary trustee because the words "personally liable" in §328 should be read as no more than coextensive with the words "as trustee" in §327. It says that to read §327 and §328 as imposing absolute liability on a vendor "* * * would be to invert the whole structure of the Maryland Retail Sales Tax Act by making the vendor, and not the purchaser, the person on whom the tax is imposed." It is true that the sales tax act imposes primary liability on the purchaser to pay the tax and we have so held repeatedly, *Comptroller v. American Cyanamid*, 240 Md.     ,

and cases cited, and, indeed, a possible ultimate liability. See §331 of Art. 81 of the Code, making the tax payable directly by a purchaser to the Comptroller if the purchaser has failed to pay the tax or a vendor has failed to collect the tax on a taxable transaction. Nevertheless, it was competent for the Legislature to provide that in given situations, such as the failure of a vendor to collect the tax or to pay over to the State the sales taxes collected or required to be collected, that the delinquent vendor be declared to be an alternate taxpayer, absolutely bound to see that the proper sales taxes reached the Comptroller, and we think the Legislature did so provide in various sections of the sales tax act particularly §327, §328 and §342. The provision in §327 that the vendor collects the tax as trustee standing alone would support Rockower's position, but that provision must be read with other parts of the act to ascertain the true intention of the Legislature. Section 328 imposes on the vendor a personal liability for taxes collected or required to be collected. This to us clearly means a liability different from and greater than the liability the vendor would have as a trustee and imports an absolute obligation on a vendor to collect and pay over to the Comptroller the money collected from the purchaser if it is available or the proper amount of his own money if it is not. So read, §327 makes sales taxes collected by a vendor trust funds subject to the rules of law as to identifiable trust funds in the hands of bankruptcy trustees, receivers or depositaries, and §328 adds a further provision to insure the revenues of the State—the personal absolute liability of a vendor. This interpretation of §327 and §328 is supported by the provisions of §342 (Supp. 1965) which makes the sales tax from the time it is due "* * * a personal debt of the person liable to pay the same to the State of Maryland," and the debt "* * * shall be a lien upon all the property, real and/or personal, of any person liable to pay the same to the State * * *." A vendor is a person liable to pay sales taxes to the State in some situations and certainly making his obligation to pay a personal debt, subject to a lien on all his property, is entirely inconsistent with the theory that the vendor's liability is only that of a trustee.

Courts in other states where the purchaser is made primarily

liable for the payment of sales taxes have reached the same conclusion as have we as to the absolute liability of a delinquent vendor under statutes substantially the same as the Maryland sales tax act. See *In Re Atlas Television Co.* (N. Y.), 6 N. E. 2d 94, 96; *City of Philadelphia v. Heinel Motors* (Pa. Super.), 16 A. 2d 761, 766; *State v. Woods* (Ala.), 5 So. 2d 732, 736; *Williams v. Bear's Den, Inc.* (Ga.), 104 S. E. 2d 230; *White v. State* (Wash.), 306 P. 2d 230, 235.

In *Comptroller v. Atlas Industries, supra,* we construed the sales tax act as imposing an absolute liability on a vendor who did not take a resale certificate and held that he could not escape this liability by showing the purchase was in fact made with intent to resell.

There is little substance to Rockower's final contention that it must be refunded the taxes it paid to release liens against its subsidiaries because the assessment procedures which underlay the liens and the liens were irregular.

The taxes which Rockower paid to release the various liens were due by the various Rockower wholly-owned subsidiary corporations when the liens were filed, as this opinion shows. The chief claim of error is that Rockower-71 Corp. owed only $1,643.26 but that a lien claiming $24,404.85 was filed against its property. It may be assumed that if the goods levied on had been sold and Rockower-71 Corp. could have shown a separate corporate identity, it would have been entitled to receive a refund of all of the sales proceeds in excess of $1,643.26 and the expenses of sale. Neither Rockower, the parent corporation, nor the 71 Corporation chose to challenge the validity or propriety of the lien against the 71 Corporation but, rather, in at least partial consideration of the waiver by the State of interest and penalties of some $6,000, decided to pay the taxes its subsidiaries owed in order to release not only the 71 Corporation lien but all the liens against the property of other subsidiaries. It is not shown that any subsidiary paid more than it owed and, in any event, Rockower, the parent company, can control what is paid by each subsidiary. Rockower, having paid taxes which were due, may not now receive back those taxes in whole or in part because there may have been irregularities in the procedures which led to the payment.

*Order affirmed, with costs.*

BARNES, J., filed the following dissenting opinion.

I would reverse the decision of the lower court in favor of the Comptroller on the ground that Towers and not Rockower was the "vendor" under the applicable provisions of the Retail Sales Act (the Act), the Regulations of the Comptroller (the Regulations), and the contemporaneous and consistently continued interpretation by the Comptroller of the Act and the Regulations as constituting Towers the "vendor" in this very situation,—until it became financially advantageous to the State to take a contrary position.

The case at bar does not involve a definition of "vendor" or of "sale" as these terms would be understood at common law, under the Uniform Commercial Code [1] in force in Maryland on and after February 1, 1964 or under the Uniform Sales Act [2] in force in Maryland from June 1, 1910 to January 31, 1964. These words are specially defined by the Act.

Section 324(b) of Article 81 of the Code [3] defines "vendor" as *"any* person *selling property or rendering services* upon the *sale* of which a tax is imposed under § 325 of this subtitle." "Sale" or "selling" is defined by Section 324(d) as *"any* transaction whereby *title or possession, or* both, of tangible personal property *is or is to be transferred by any means whatsoever* for a consideration including *rental, lease* or *license to use,* or *royalty,* by a vendor to a purchaser, *or any transaction* whereby *services* subject to tax under §325 of this subtitle are rendered for consideration to any purchaser or to any vendor." (Emphasis supplied).

Section 324(f) defines "Retail sale" and "sale at retail" as "the sale in any quantity or quantities of any tangible personal property or service taxable under the terms of this subtitle. * * *"

It will be noted that the statutory definition does not limit

---

1. LAWS OF MARYLAND 1963, ch. 538 (Code (1964), Art. 95B, §§ 1-101 to 2-725).
2. LAWS OF MARYLAND 1910, ch. 346 (Code (1957), Art. 83, §§ 19-96).
3. All section references are to Article 81 of the Annotated Code of Maryland, 1957 Ed., unless noted otherwise, with amendments through 1965.

the definition of "vendor" to the person who *has* title or possession *prior* to the *transfer* of title or possession, or both, but *for the purposes of the Act,* the vendor is the person who is *selling* property and "selling" is defined to mean *any transaction* whereby the title or possession, or both, is or is to be *transferred* by any means whatsoever. In other words, it is the person who makes or effectuates the *transfer* of title *or* possession, *or* both, who is the "vendor" regardless of *from whom* title is transferred, or *from whom* possession is transferred. This was a deliberate statutory definition to impose the tax on the person who made the transfer of title or possession, or both, and who *collected the money* for that transfer. The purpose of the statutory definition was practical rather than theoretical. Its purpose was to impose the tax when the money was collected for the sound practical reason that the person collecting the money would then and there put aside from that money thus collected, the retail sales tax due the State at the time of the *transfer.*

Section 324(q) defines "taxpayer" as *"any person required* by this subtitle *to make returns* to the Comptroller or to *pay or pay over* to the Comptroller *the tax* imposed by this subtitle." (Emphasis supplied).

Section 327 provides after requiring a charge for the sales tax separate from the sale price, that "The tax shall be paid by the purchaser to *the vendor as trustee* for or on account of the State, and *the vendor shall be liable for the collection thereof* for and on account of the State." (Emphasis supplied).

Section 335 *requires* the *"vendor"* to file the necessary return to the Comptroller. Section 336 provides for the form of the returns and requires, *inter alia,* the showing on the returns of the gross proceeds of the vendor's business for the month for which the return is filed, the gross *proceeds* of the business *of the vendor* upon which the tax is computed, and the amount of the tax for which the *vendor is liable.* Section 337 requires *each vendor* to pay to the Comptroller at the time of filing the return, the taxes imposed by Section 325.

Section 338 (as amended, LAWS OF MARYLAND 1959, ch. 145, to reduce the 3% allowance to 2%) provides that:

"*The vendor* shall be entitled to apply and credit *against the amount of tax payable by him,* as stated in §337 of this subtitle, an amount equal to two percent (2%) of the gross tax *to be remitted by him* to the Comptroller, to cover the *vendor's expense* in the *collection and remittance of said tax; * * *.*"

Rule 3 of the Regulations provides, in part, as follows:

"The sales tax applies to the *total sales price* on *all sales* made on the same occasion by the *same vendor* to the *same purchaser,* without regard to the value of the sale price of the separate items aggregating the total amount of the sale. Sales made 'on the same occasion' means the combined sales to the purchaser *in any place of business,* whether or not *at different counters or in different departments,* on any one business day." (Emphasis supplied).

Rule 66 of the Regulations provides:

"Every factor, auctioneer, broker or *agent acting for any principal,* or entrusted with possession of any bill of lading, custom house permit or warehouse receipt for delivery of any tangible personal property or entrusted with possession of any personal property for the purpose of sale *shall be responsible for the proper collection and remittance of the tax* with respect to such sales except where such factor, auctioneer, broker or agent acts for a disclosed principal who would have been exempt under the 'casual and isolated' exemption if such principal had made the sale himself." (Emphasis supplied).

Into this statutory and administrative setting, the present case arose. As pointed out in the majority opinion the facts are undisputed. The statement of the facts in the majority opinion should, I think, be somewhat amplified.

Towers began operating its stores in Maryland in 1959. All interior and exterior signs, all labels, sales slips, price tags, wrappings and packaging bore the name of "Towers" only. The

stores were known to the public by the name of "Towers." Towers, however, licensed departments in its stores to various licensees who were not known to the public as such.

In February 1961, Rockower first became a licensee of men's wear departments in Towers stores. At the time of the assessment involved in the case at bar, Rockower (or its wholly owned subsidiaries) was operating as licensee, in eight Towers stores.[4] The "Master License Agreement—Towers License Agreement" (the Agreement) is interesting and of importance in this case. Taking the Agreement of June 27, 1961 between Towers of Brooklyn Park, Inc., a Maryland corporation (thereafter in the Agreement referred to as "Licensor") and Rockower Bros. Inc., a Pennsylvania corporation (thereafter referred to in the Agreement as "Licensee") as characteristic of all of the licensing agreements, one finds the following relevant provisions: Towers, the licensor, granted Rockower, the licensee, "the license and privilege of conducting a department" within the Towers store at Brooklyn Park designated as the Men's department for the sale at retail of men's clothing only. The space consisted of 5738 feet "assigned by the Licensor (Towers) at its sole discretion." Towers reserved the right to relocate Rockower's space by assigning Rockower other suitable and desirable space in the store of substantially equal size and if the volume of sales in proportion to the floor space occupied by the department did not substantially conform to the average of the proportion for the entire floor on which the department was located, Towers "within its sole discretion, based upon all of its records and all other information available to it," within 30 days after the end of any quarter, could *reduce* the floor space of the licensed department in such manner as, "in

---

4. The names of the Rockower subsidiaries and the Towers stores in which they leased were as follows:

| *Rockower Subsidiary* | *Location of Towers Stores* |
| --- | --- |
| Rockower Bros.-Md. Corp. | Dundalk, Brooklyn Park, Langley Park, Wheaton and Liberty Road |
| Rockower-71 Corp. | Timonium |
| Rockower-Carrollton | Carrollton |
| Rockower-78 Corp. | Suitland |

Licensor's discretion", enabled the proportion of Rockower's department to conform to the average for the entire floor.

The licensee Rockower was to pay to the licensor Towers for "the license and privilege" granted, a sum or commission equal to $7\frac{1}{2}\%$ of the "net sales" as defined, of "merchandise sold in or emanating from said department." In the definition of "Net sales" the proceeds of sale are "less returns, exchanges, employee's discounts, credits, refunds, Federal Excise Tax and *State Sales Tax*, if any." (Emphasis supplied).

There was a provision whereby Rockower was to pay to Towers 3% of the net sales for advertising, which was to be spent by Towers for promotional and institutional advertising and Rockower was forbidden to advertise the business of the department without Towers' approval of the advertising medium and text.

The Agreement provided in paragraph 4 for the handling of sales. "All moneys from sales of merchandise in or emanating from" the department "shall be paid directly to and handled by Licensor's cashiers." The licensee agreed "that the receipts (including *checks accepted by the Licensor*) from the operation of said department—*shall go through the regular channels of the business of Licensor,* according to its usual and ordinary methods of doing business, *in the same manner as sales made by Licensor for its account* in its general business, * * *." (Emphasis supplied). The receipts were to be deposited daily in the account maintained by the licensee (in a bank designated by the licensor), less $10\frac{1}{2}\%$ (the $7\frac{1}{2}\%$ plus the 3% advertising charge already referred to) and the licensor was to furnish the licensee weekly a statement of these deposits with the duplicate deposit slips for the preceding week. Any credits or adjustments for merchandise returned by customers were reflected in the next succeeding deposit. All disputes with customers in regard to the merchandise "shall at all times be under the control of Licensor." If there were shortages or overcharges by the licensor's cashiers, these shortages or overcharges were prorated among the licensee and other licensees of the store based on the percentage of licensee's sales at the time of the shortage or overcharge. It was further provided that "the figures recorded for each department by the cash reg-

isters *shall be conclusive with respect to the volume of business by* the various licensees." (Emphasis supplied).

Paragraph 6 provides for the payment of taxes, assessments, fees, etc., and is as follows:

> "6. Licensee shall pay all the *taxes assessed by any taxing authority on the merchandise* carried in said department *and on all of the fixtures, equipment and machinery owned by Licensee* and installed therein, including but not limited to *sales taxes* of the *State of Maryland* and *taxes* of the *City of Baltimore* and *shall pay any license or other fee incident to the conduct of said business,* whether billed directly to the Licensee or to the Licensor, and shall pay all taxes, including but not limited to Social Security and Unemployment taxes, State and Federal, which are now imposed or may hereafter be *imposed on the business* carried on in said department and on the Licensee as an Employer. Licensee shall become voluntarily liable for State Unemployment compensation taxes, if it engages fewer personnel than required for involuntary liability under the State laws. In the event that an unapportioned tax is assessed against Licensor which shall include Licensee's property, Licensee agrees to pay such proportion of said tax as the value of its property at the time of assessment bears to the total value of the property assessed at the time in said store." (Emphasis supplied).

The majority indicates that this imposes the obligation upon Rockower, as licensee, to pay Maryland sales tax, and, by inference at least, to pay the sales taxes involved in this case, but it seems clear to me that paragraph 6 only imposes liability to pay *possible* sales taxes on "fixtures, equipment and machinery" installed by the licensee in the department. It is apparent that no sales tax will be "assessed on the merchandise," and the only time a possible sales tax would be imposed and payable under paragraph 6 would be upon the purchase of Rockower of fixtures, equipment and machinery not for resale and not otherwise excluded or exempted under the Retail Sales Act. The

provision of paragraph 6 in regard to sales taxes is not a *general obligation to pay sales taxes,* but only an obligation to pay those sales taxes possibly imposed upon it *as purchaser* of the equipment, etc. to be installed. The whole agreement indicates that all collections are to be made by Towers from the purchasers of merchandise and these collections would include the sales tax paid, as a separate item, by the purchasers of the merchandise.

The Agreement further provides in some detail the merchandising policy to be followed by the licensee and generally that "the Licensee will conduct its said department so as to protect the business reputation of Licensor's store."

In paragraph 10 of the Agreement, the licensee is required to maintain the department "in continuously clean and neat condition in keeping with the standards of Licensor and to the reasonable satisfaction of Licensor * * *." The general nature of the line of merchandise is provided for and it "shall be comparable in quality, quantity and value to the general stock of merchandise carried by the store." It is also provided that "Licensor reserves the right and privilege of inspecting and comparing as to prices, quality and value, the merchandise carried and services rendered by Licensee with items or services sold in Licensor's store and other retail establishments, and Licensee shall either meet such prices, quality, and value within twelve (12) hours after oral or written notice by Licensor, or remove the merchandise concerned from display for sale."

In paragraph 11, it was provided, that the licensee shall furnish and engage qualified and competent employees for the conduct of the department. Although all employees are hired by the licensee, the licensor has the right to require the licensee to dismiss immediately from its employment any employee deemed unsuitable *or* who violates any of the rules and regulations of the licensor or who shall in any way conduct himself to the dissatisfaction of the licensor. The employees are required to conform to the rules and regulations set forth in attached Schedule B "as well as all reasonable rules and regulations as hereafter may be promulgated or put into operation by the Licensor." Schedule B entitled "Store Policies for Employees" contains 9 minute regulations, giving the working hours, the cloth-

ing and badges to be worn, the parking of employee automobiles, the marking of merchandise, a prohibition against eating or smoking on the selling floor, etc., and there was also attached as a Schedule B a "Store Policy for Department Managers" containing 18 regulations, including the 9 employee regulations, and 9 additional ones including one prohibiting the employment of relatives in the same department.

It is quite clear to me from the Agreement that Towers, as licensor, was dominant in the operation of the business of the department; it was no mere agent of Rockower, the licensee. Even if it were an agent, Towers would "be responsible for the proper collection and remittance of the tax with respect to such sales" by virtue of Rule 66 of the Comptroller already set forth in full. In my opinion this Rule is valid, and recognizes and is consistent with the policy of the Act, i.e., to treat as the "vendor" the person who makes the transfer of title or possession, or both, and who collects the money from the purchaser, both for the merchandise and for the sales tax. The suggestion in the majority opinion that the intent of Rule 66 was "merely to supplement the legal liability of a vendor by imposing an additional liability upon a vendor's agent," would, in my opinion, make Rule 66 invalid as the imposition of such *additional liability* is indeed a legislative power and could not legally be imposed by the Comptroller.

In the operation of business under the Agreement all of the receipts were taken in through the central cashier locations maintained by Towers and operated by Towers employees, similar to the usual operation of the cashier check-out maintained at supermarkets. The Towers-operated cash registers contained a key identification for each licensed department but only had *one* sales tax key, which was used by Towers to identify *all sales taxes* collected for the cumulative total sales made in all licensed departments, without separation, even though the merchandise might come from a number of licensed departments. The funds collected by Towers for sales taxes were retained by Towers and were never paid over to Rockower.

In 1959, Towers registered with the Comptroller and obtained a sales tax license for each of its locations *as a vendor*. Towers filed sales tax reports *as vendor* for each of its loca-

tions on which *all of the sales of goods* from all of the departments, including those licensed to licensees, were reported on a consolidated basis and all of the sales taxes were remitted by Towers to the Comptroller on the consolidated basis.

Barton C. Layton, an auditor of the Retail Sales Tax Division of the Comptroller testified at the hearing in this case before the Comptroller that since the inception of the first two Towers stores in Dundalk and Brooklyn Park he was aware that there were licensees in each of the Towers stores and that Towers was filing a combined master sales tax return of all store sales for each store. At first he was unable to determine who the licensees were, but continuously sought to obtain registrations from the licensees, but he made no effort to have each individual licensee file individual sales tax returns because his instructions were to report the tax at each store *under one account number assigned to Towers.*

Edward F. Engelbert, Chief of the Retail Sales Tax Division, testified that in 1959 his office attempted to obtain registrations for sales tax account numbers for the licensed departments, but, with the knowledge of the Comptroller's office, Towers continued to collect and remit all taxes for each location on a consolidated basis.

When an application for a Maryland Retail Sales and Use Tax License was applied for by one of the Rockower subsidiary corporations, at the request of Towers (using the application of Rockower-78 Corp. for the Suitland store signed on September 19, 1962 and apparently filed later in September 1962 as characteristic), on the attached "Retail Sales and Use Tax Report" the only one of the 18 items requesting information is filled in, i.e., "Net tax due and paid with return" and this has the word "None". Above this answer appears the notation "Taxes collected and remitted by Towers."

The remaining facts in regard to the late remittances both to Rockower and to the Comptroller for sales taxes and subsequent proceedings are sufficiently set forth in the majority opinion and need not be repeated here. It may be added, however, that even after Towers failed to file the December, 1962 report and pay the sales tax due, the Comptroller *made demand upon Towers* for the *payment* of the sales taxes and *sought a bond* from

Towers through the Creditors' committee formed to take in Towers' receipts in early February 1963. This bond may be required by the Comptroller from a *"taxpayer"* to protect the revenues under § 340 and, as has already been indicated, a taxpayer is defined as "any person required by this subtitle to make returns to the Comptroller or to pay or pay over to the Comptroller the tax imposed by this subtitle," and such a person is a "vendor."

It is entirely correct as stated in the majority opinion, that the State may not be estopped by the acts of its officers and agents. The question presented here, however, is not primarily one of estoppel but of *an interpretation* of the statutes and regulations by the Comptroller that Towers was the "vendor" within the meaning of the applicable statutes and regulations.

Although in my opinion, Towers is clearly the "vendor" under the applicable statutes and regulations, if it be assumed for the argument that the statutes and regulations are at least ambiguous in this regard, then the administrative interpretation, orginally made and continued by the Comptroller after knowledge of the situation, is highly persuasive to this Court. As Judge Delaplaine, for the Court, stated in *Department of Tidewater Fisheries v. Sollers,* 201 Md. 603, 615; 95 A. 2d 306, 311 (1953) :

> "It is true that no custom, however long and generally it has been followed by administrative officials of the State, can nullify the plain meaning and purpose of a statute. But *where the language of a statute is susceptible of two constructions, a long continued and unvarying construction applied by administrative officials is a persuasive influence in determining the judicial construction, and it should not be disregarded except for the strongest and most urgent reasons."* (Emphasis supplied).

See *Shapiro v. City of Baltimore,* 230 Md. 199, 216, 186 A. 2d 605, 614 (1962).

As I have indicated, however, the statutory definitions indicate that Towers was the "vendor." It alone collected the money for the merchandise and for the sales tax. At the time

of collection both title and the ultimate right to possession passed to the purchaser and not before. Prior to collection, the customer, who had taken a qualified possession of an article, could change his mind and return it to the racks or counter and take a qualified possession of another article in its place or indeed decide that he would not purchase any article of that type. It seems clear that neither title nor the ultimate right to full and complete possession passed *unless and until* the money was collected at the check-out cash register *by Towers*. This act of Towers was the act which *transferred* both title and the ultimate right to possession and under the statutory definition this constituted Towers the "vendor." Towers at the time of that act collected from the purchaser, as a separate item as required by the Act, the sales tax due from all of the merchandise presented by the purchaser—whether obtained from one or more licensed departments or from a department possibly not licensed—rang it up as an entirety on a single key on the cash register and thereafter *made the return* to the Comptroller and *paid the sales tax as the taxpayer*. All of these returns and payments were accepted by the Comptroller as a compliance with the provisions of the Act and the Regulations. None of the sales tax money was ever received by Rockower. Rockower, on any returns filed by its subsidiaries gave no details and paid no tax, but, on the contrary, noted that the tax was collected and remitted by Towers. The Comptroller knew and accepted the returns and payments by Towers under one account number. The Comptroller sought a bond from Towers as taxpayer pursuant to the provisions of the Act. Towers deducted the 2% commission to cover the *"vendors'"* expense as provided by the Act and this appeared on the returns accepted by the Comptroller. When Towers failed to file the December 1962 tax and pay the sales tax, the demand for payment was made upon Towers not upon Rockower or its subsidiaries.

Then too, since under §327 the tax is collected from the purchaser by the vendor as "trustee for and on account of the State," it seems clear to me, that this shows that it is the person who receives the purchase price and the sales tax in hand, exercises dominion and control over it, who is the vendor-trustee. Towers alone had this control, Rockower never did have

it. As there can be no trust without a *res,* it follows that Towers alone was the vendor-trustee and Rockower was not. I would so hold.

If it be assumed, for the argument, that Rockower and not Towers is the "vendor," I would agree with the rejection by the majority of the alternative contention by Rockower that as an involuntary trustee, it should not be surcharged with the funds collected and misappropriated by Towers because Rockower used reasonable care in selecting Towers and otherwise used due care with respect to the trust funds.

I much more reluctantly agree with the majority that if it be assumed, *arguendo,* that the Comptroller was entitled to make an assessment against Rockower at all, the Comptroller should be permitted to retain the funds obtained as a result of the unusual and vigorous collection procedure used by the Comptroller in the case at bar and described in the majority opinion. The procedure adopted has overtones of an abuse of process, but I cannot say that under the circumstances of this case there was an illegal action requiring reversal on this ground. It was, however, in my opinion a course of action which is not to be commended.